Thank you, Mr. Chief Justice, and may it please the Court. The Vacancy Reform Act's limitation on an individual serving as both the nominee and as the acting official for a single office applies only to someone who is currently the first assistant in that office and is acting pursuant to the Automatic Service Rule set forth in Section 1251 of the National Labor Relations Act. Under Section 1345A1, both the GAO and OLC adopted that interpretation of the Act shortly after its passage, and in the nearly two decades from passage of the Act till the D.C. Circuit decision here, Presidents of both parties have made scores of nominations and designations based on that interpretation of the text without recorded objection from even a single Senator or staff member. Sotomayor, can I ask, as you read this statute, suppose you just took out these words, notwithstanding subsection A1, what would then the effect of the statute be? So, Your Honor, I think that our textual argument would be much more difficult and that the effect of the statute would be effectively to override A1, A2, and A3. The notwithstanding clause really is the anchor of our textual interpretation, but its strength, I think, comes not only from its text, but also how it fits so well with both the history, structure, contemporaneous interpretation and practice. Kagan. Kagan. But just focusing on text for a minute, if that's true, if the entire textual argument really does rest on the notwithstanding subsection A1, I mean, typically when you have a notwithstanding clause, it means, you know, take away subsection A1, not, you know, close your eyes to subsection A1. But it doesn't do anything more than that. So why do you think it should be taken to do something more than that in this case? Your Honor, we think that because it's a routine application of the expressio unius canon in the context of the notwithstanding clause. And so we think it has power for at least three reasons. First, and we're on pages 82a and 82 83a of the government's brief, the expressio unius implication is very strong here, because if you read the statute on page 82a, A1 sets out the first assistant rule, A2 sets out the PAS rule for a Senate-confirmed official, and A3 then sets out the career official or the agency official with substantial service. The very next words in the statute are notwithstanding subsection A1. So after A1, A2, and A3, Congress said notwithstanding only A1. We think the expressio unius canon is particularly powerful because Congress could have said, if we wanted to do what Respondents say, notwithstanding subsection A, but it did not do that. And it's particularly powerful as well because the notwithstanding clause, as Your Honor suggests, is one that Congress uses all the time. Congress will say notwithstanding any other provision in the code, notwithstanding any other section of the Act. Kagan. So the hypo is I'm at a restaurant and I'm talking to my waiter and I place three orders. I say, number one, I'll have the house salad. Number two, I'll have the steak. Number three, I'll have the fruit cup. And then I tell the waiter, notwithstanding order number three, I can't eat anything with strawberries. So on your theory, the waiter could bring me a house salad with strawberries in it. And that seems to me a quite odd interpretation of what's a pretty clear instruction, no strawberries. So, Your Honor, I think this really is fundamentally different for a number of reasons. First of all, we have before us, in contrast to your waiter hypothetical, we have before us the very history of this clause, which suggests an interpretation very much in line with the government's interpretation. So I take it, you know, that you have some arguments, some strong arguments on history and on practice. But, you know, again, I'm just sort of — isn't that just a peculiar way to understand the, you know, notwithstanding order number three, no strawberries? So I don't think it is, Your Honor. And I want to footnote the — if, for example, you had been a regular member of that restaurant, a regular diner at that restaurant, and had always understood that you couldn't have strawberries with only one of those things, then the waiter would be justified in interpreting it differently, and we have that contemporaneous practice here. But getting to Your Honor's textual point only for the moment, I do think that's exactly what this Court held in Pourceau, in — where there was a notwithstanding clause that said, notwithstanding the provisions of the Act, funds — you have to rely on advance appropriations, and this Court said, no, that doesn't override the existence of the Tucker Act. I'd point the Court as well to the case cited in our briefs, SEC v. Mount Vernon Memorial Park, which is a situation extremely similar to this, if I could just take a sec on that, because I think it will help. That was an interpretation of the Investment Company Act, and it said an investment company is an issuer who meets one of the following, A-1, A-2, and A-3. And for A-3, there was something called a B-1 limitation, and it said, notwithstanding A-3, an issuer is — you're not an issuer unless you're in the business of issuing securities. And what the Court said was that the issuer who fell within that limitation, the same B-1 limitation, nonetheless was an investment company under A-2 precisely because the introductory limitation was limited to notwithstanding A-3. And that case is cited in our brief. I think Schomburg is the same. Our point, Your Honor, is not that it is inevitably that way. The expressio unius canon is never — is a canon. It's an aid to interpretation. And it may be that, for example, in your restaurant hypo, that would be a — it would be clear from context. But here we really do think that all of the other aids to statutory — Alitoso, is there another explanation for why the notwithstanding clause of B-1 refers only to A-1? If it — without that, there would be a direct conflict between B-1 and A-1, because A-1 says, shall, the first assistant shall perform, whereas A-2 and A-3 say that the President may do certain things. So there isn't the same kind of direct conflict between the remainder of B-1 and A-2 and A-3 as there is with respect to A-1. So, Your Honor, that is the argument that Respondents make, and we simply disagree with that. We think there is a direct conflict between A-2, which says the President may appoint this person as an acting, and B-1, which says the President may not appoint a person as an acting when that person is also the nominee. That B-2 is a very — is a designation of a delegation of power to the President to make a designation, and it is every bit as broad as the — as the A-1 example. And if there were not — Alitos, to pick up on Justice Kagan's restaurant scenario and modifying it a bit, if she were to say, or if I were to say to the waiter, you may bring me the soup of the day, but you may not bring me soup that contains shellfish because I'm allergic to it, there wouldn't be a conflict of the same sort, would there, between those two statements? So, Your Honor, I do think that there — I do think there would be, and I think in particular, even apart from the restaurant hypo itself, the whole purpose of A-2 is to give the President the power to make a designation when he believes there is a superior official serving elsewhere in the government. That grant of power is every much restricted by B-1 as A-1, absent the introductory clause. The B-1 says the President may do this. B-2 says in some circumstances he may not do this. And that is precisely the kind of conflict that Congress was getting at. But even if you thought the text had some ambiguity here, I really do think that the other aids to statutory construction which this Court has looked to over and over really do work in our favor and really not at all in Respondent's favor here. Principally, if one looks at the contemporaneous interpretation and consistent practice, what one sees is the sponsor of the legislation identified precisely the government's interpretation. Both GAO and OLC adopted that interpretation. President's uniformity. Ginsburg-Gilbert. They did so without any elaboration. It's just a question and here's the answer. And there's no reason for the answer from OLC. And as far as GAO is concerned, they didn't say precisely what happens with Category 2 and 3. So, Your Honor, I think so two points, a number of points. But two, responding directly to both of those. With respect to OLC, our point is not that this Court should defer to it or defer to the reasoning in it. Our point is from the very beginning, from the moment the statute was passed, Congress was aware of the interpretation the executive branch was putting on it and raised no objection. And with respect to GAO, the GAO letter I think is quite significant because GAO, recall under section 3349, is the congressionally designated watchdog for the Vacancies Act. And when GAO issued its letter, which I respectfully disagree, Your Honor, I think the GAO letter is quite clear. If you look at it, what it says is there are four ways to make an acting appointment. And for number one, A1, it says, and you can't be the nominee. For the other three, it does not have that. And the whole point of that letter was to give guidance to Congress. That letter was circulated not just to the Senate majority and minority committees, but to the Office of Presidential Personnel, to the White House Counsel's Office, to OPM and OMB. And, again to Congress. Roberts, I think you're putting a significant burden on Congress to sort of speak up. There's sort of an estoppel against Congress. If they don't speak up in every instance where they think some prerogative or interpretation is being misapplied or prerogative taken away from them, then they are deemed to have acquiesced in it. And this is a context in which that might be particularly inappropriate, because maybe the particular appointment contravenes your theory, but a significant number of people in Congress want to see that vacancy filled, you know, under the --" even though it contravenes these more general provisions. And that might not be a particular battle they want to fight at that time. I think it's a very serious burden to impose on the legislative branch. So, Your Honor, we're not imposing a burden on the branch, but we are asking you not to turn a blind eye to what really happened in this context. What led up to the Vacancy Reform Act was decades of Congress raising exactly the kind of objections that one would expect. There were oversight hearings. There were GAO letters. There were congressional research reports. There were letters back and forth to the Attorney General complaining about the way the Justice Department and the executive branch was handling the vacancies and ignoring the Vacancies Act. Then what we have is an interpretation. Then what we have is the Vacancies Reform Act and an interpretation set out by the author of the very provision we're talking about, Senator Thompson, an open discussion by GAO, the watchdog, of the Vacancies Act designated by Congress and by OLC, and then  So we're not putting a burden on the branch. Ginsburg. But you have on the other side of the Senator, was it Thompson? You have Senator Byrd, who seemed to be putting on it. The construction that Respondents do. So I think that actually Senator Byrd is quite vague about that and omits the notwithstanding language. But even if you thought that was sort of a draw, I would note that Senator Byrd, who again was not shy and had weighed in on these Vacancies Act issues, never raised an objection when the when Presidents across three administrations continued it into interpretation. I think it should be noted that, you know, it's one thing to consult legislative history to understand the whole context in which the Congress was acting, but it's quite another thing to rely on an isolated statement and later contradicted by another senator. And even for those who at times find legislative history helpful, I think this is where it's at its weakest and most unpersuasive. So, Your Honor, I disagree. I don't disagree with Your Honor. It is merely one, though, of a consistent stream, given the OLC and GAO practice. I really would like to get back to the Chief Justice's point, if I could. It is not at all an estoppel by Congress. It is the reason why this Court has put, should put particular weight on this silence here, is because it reflects a contemporaneous and uniform interpretation of Congress's understanding of how its own powers are being, are or are not being infringed. And given the past history How is that not an estoppel? It's not an estoppel, Your Honor. What it is is further evidence that the interpretation of the plain language that we're putting forward is correct. The language supports it. The — everybody understood and has acted for 20 years on that assumption. And in a context It sounds like what the point I was trying to make is you are putting weight on the fact that they didn't do anything. Now, you say you've got other arguments, too, and I appreciate that. But, no, what did they do then? Absolutely, Your Honor. No, I am putting weight on what they didn't do. To me, it is very much the dog that didn't bark. Congress had been barking quite loudly and vociferously for decades on this very issue. And then it adopted a statute that was interpreted by its own watchdog in a certain way, and then the barking stopped. And it seems to me this Court is really ignoring reality to not see that that has important weight. But even if it's But even if it's Why don't the reasons What would be the consequences if we've affirmed your brief? I didn't list a great parade of horribles. It seems to me that our system is quite capable of accommodating the Respondent's argument. And on that point, eight judges have looked at this, and every one of them has come to the conclusion that the Respondents reach. So, Your Honor, I think there are important consequences. So, first, Congress understood that there are often important positions that don't have first assistance to take over. To quote just to cite just one, at page 11A of the chart, there's an appointment of Linton Brooks, who was named as the director in the National Nuclear Security Administration. They're the folks that oversee nuclear counterterrorism. When the Senate-confirmed director of that agency left, there was no first assistant, and President Bush put in Linton Brooks, both as nominee and to act, to take over. So Congress was well aware that there often weren't first assistants around. Can I ask you about the consequences going backward? Yes. Your brief did not talk about this. But do you think that if we find against you that that subjects to some uncertainty actions that these 100 plus officials took? Yes, Your Honor. And if so, what actions? So, Your Honor, it does that. And that's the second point to Justice Kennedy's question. It does subject the past officials to substantial uncertainty. In truth, we don't know exactly the extent of it, because we don't know when we'll have defenses of waiver. We don't know when we might, for some things, be able to ratify. But there's no doubt that there are significant reliance interests that the executive branch But didn't Judge Henderson say about that this is not going to be a floodgate situation, because you would have to raise it. Here it was raised before the ALJ. And for these other cases where the vacancy was long-filled, there would be no possibility of making, very late in the day, an argument that you didn't make before. So, Your Honor, I'm in a tough position because I don't want to argue too hard against defenses that we're going to want to assert later. But I do think what Judge Henderson was talking about in particular was the NLRB situation, which is a different situation because there are particular hearings and the NLRB has an ability to ratify that other agencies don't. But what this is quite --. Kagan, suppose you didn't have those defenses, because, you know, I'm not sure why you would necessarily, given that the statute says they're void ab initio if people take it as against these procedures. So if you didn't have those defenses, as you look down the list of these officials, what kinds of actions are you most worried about being unsettled? So, Your Honor, we have, for example, Adam Zubin, who is the Undersecretary for Terrorism and Financial Crimes. He does the terrorist-sponsored designations in the Treasury Department. We have the Deputy Attorney General. We have the head of OPM. These are people who issue or may issue regulations, who make designations, who make important decisions in the executive branch. It is, I think, the reliance interests of the executive branch are quite strong here. This is a situation where we have put very senior officials in place at the — with the understanding that what they were doing based on — that what they were doing was lawful at the time based on the language of the statute and the interpretation provided on it. Kagan. I mean, those are all very important positions that you named, but it's not absolutely clear to me that those — that there are categories of decisions that those people take that we should be worried about. And if there are, I would like to know about those categories of decisions. So, Your Honor, I can't list them chapter and verse, but I do think the kinds of things we're worried about are rulemakings by the heads of agencies, the particular designations by the senior officials, and decisions on litigation and other things that may be subject to challenge. We have not gone back and cataloged all of the potential ramifications, but we do think that with over 100 officials over the course of 20 years, the effects of this are really quite significant. Kennedy. So does that 100 include or exclude military officers, do you know? It is not including military officers, Your Honor. These are the acting officials in the executive branch, but I don't think they are military officials. The interpretation that the Court is putting forward, if I could make a couple of points on the structure and why we really don't think that this is the right way to read it and why our way makes sense. We think what's reflected in the Vacancies Act is a judgment by Congress that before an individual serves as both the acting and the nominee, that there be one of two protections, that the individual either have been Senate-confirmed before or that they meet a length of service requirement. So in A2, what one sees is that that's a prior Senate confirmation. In A3, it's a length of service. And if one looks at C1, which addresses Senate-confirmed officials whose terms have expired, again, it's Senate confirmation. The entire purpose of B1 is to extend those protections to first assistants. So what B1 does is for first assistants, it puts on a length of service requirement. And then in B2, it exempts from that length of service requirement what the very individuals who have received prior Senate confirmation. The package works as a seamless whole. Congress was not putting on a first assistant requirement on a PAS appointee from elsewhere in the government, and it was not putting on a first assistant requirement on a career agency official moved into an acting position. What it was doing was making sure that first assistants, who were both nominees and the acting, had one of the two protections. It's also consistent with the way the legislative history is and the drafting history. With respect, I think this is very important to the PAS positions. It had been the President's prerogative expressly under the Vacancies Act back to 1868 to take a PAS officer and put him into an acting position and then still be able to nominate him. The first draft of the bill preserved that. So after all of the rancor, after all of the unhappiness of the Vacancies Act, the first draft of the bill allowed an acting officer to come in automatically under A-1 or as a PAS under A-2, and the B-1 restriction only applied to A-1. There's no dispute. And so then what happened? Then there was an objection that the bill didn't give enough authority to the President. And so changes were made to give the President more authority. And what respondents would have you believe is that Congress overturned sub salentio without a single complaint, 130 years of executive branch practice. Kagan with congressional blessing. Kagan Well, why and how do you think that that change was made, then? Because the change clearly was made. In the initial draft, it obviously applied only to first assistance, and then in the final draft, not so obvious at all. And, you know, I agree with you that there's no explanation, but there is a change. Are you suggesting it was, you know, just a mistake that somehow happened? Gershengorn Absolutely not, Your Honor. And if you'll bear with me, I can explain it. The initial draft of A-1 required a, provided that the person be a first assistant to the officer, and B-1 read as it does. When Congress, Congress changed that to allow the appointment of officers who were not, who were after the officer dies, and so they changed it to first assistant to the office. The significance of that is that somebody could be appointed first assistant even after the vacancy arose. That was a very big change. If Your Honor looks at page 19A of the, of the appendix to the petition, where the bill is set out, the original bill, the way the bill read, it put the restriction only on the person who was serving at the time of the vacancy. So if the, if Congress had left B-1 the way it was, it would have created a very odd situation where the current serving first assistant would be subject to B-1, but after put in, someone put in later, was not subject to B-1. So what did Congress do? Congress changed it so that there was limitation applied to all first assistants, but then it added notwithstanding A-1, and that is the critical thing. So in other words, Congress did it, made this change to B-1 precisely to deal with the after appointed first assistants. And then it added the notwithstanding clause to say notwithstanding only A-1. And so it does seem to me, Your Honor, that it was a very important change. And I think if Your Honor traces through the legislative history and looks at 19A and where the provision works, you will see that that was the reason, that that was the reason for the change. Ginsburg. Ginsburg. If you, if your interpretation is the correct one, what is your answer to the horrible that appears in the, in the Respondent's brief at 33 and 34? They say if you read the statute the way the government does, then you could have somebody in there who has never been approved by Congress, by the Senate. You could have someone there upwards of, they calculate, 630 days. So, Your Honor, the response to that is, there's no doubt that someone can serve for that length of time, and that Congress understood that. That's the consequence of the time limits in the Vacancies Act. What Respondents are arguing is that that should only be true for first assistants, but should not be true for, for, for individuals that the President appoints under A, designates under A2 and A3. And it's that irrationality that we think the statute, it's that difference that we think the statute just doesn't justify. So just to be clear, it is, it is crystal clear under both Respondent's view and our view that an individual can serve for a very long period of time. That's the consequence of the, of the 210-day period and the various ways you can extend it. The question before you, though, is whether it makes sense that Congress decided that only the first assistants could do that. But there are real reasons to doubt that. A2 and A3 were put in precisely to give the President himself, and it could only be the President, it's not delegable, the chance to choose a superior, a superior officer, a better, a better placed and more talented officer than the first assistant. It seems very odd in that situation to say that the 1,100 days could, or however many days, could only be served by the first assistant, but not by someone chosen by the President for that very reason under A2 and A3, if I could reserve the balance of my time. Roberts. Thank you, Mr. Gershengorn. Mr. Jaboretsky. Mr. Chief Justice, and may it please the Court, four features of the FVRA's text and drafting history compel our interpretation. First, Congress used the broad terms a person and this section. Second, notwithstanding, is a term of expansion. It does not contract the broad meaning of person and section. Third, the government's interpretation makes subsection B2 superfluous in multiple ways. And fourth, at the time that Congress added B2, it deleted language from the initial draft of B1 that expressly limited the provision to first assistants. The revised language encompasses all acting officers. I agree that person and section are very strong arguments for you. Suppose what the statute said is notwithstanding A1 and A2, and what would then be your argument with respect to whether or not it affected A3? I still think in that circumstance that person and section would apply to A3, but the reason that that would be a different case is that there is no meaningful distinction between A2 and A3 and the role that they play in the statute. There is a meaningful distinction between A1 on the one hand and A2 and A3 on the other hand, and it makes sense because of that distinction that Congress would single out just A1. I don't get that, Mr. Dvoretsky, and maybe this follows the government's line of thought. But, you know, I've been the A1 says the first assistant shall be the acting officer, and then B1 says no, she may not be, right? And A2 and A3 doesn't use the words shall, but it says the President may appoint any of these people, and then B comes along and says, no, the President can't appoint some subset of them. So the basic conflict seems to me to be the same in both cases, which is that the second clause says not so fast, not with respect to those people. Justice Kagan, the difference is that A1 is a self-executing provision. It automatically places the first assistant into the vacant office, and B1 then takes the person out. A2 and A3 are grants of discretion that have to be understood side by side with the spokesman. But those grants of discretion are very broad, and then B1, again, takes the person out, takes the person out of the grant of discretion just as it takes the person out of the self-executing provision before them. They're broad only if read in isolation, but they can't be read in isolation as a statutory matter, and oftentimes the President doesn't read them in isolation as a practical matter. In other words, there is no way to avoid the conflict created between A1 and B1, because A1 puts the person in the job and B1 takes them out. If the President, however, simply reads A2 and A3 together with B1, then he knows what the limitations are on his discretion, and he can avoid that ripping out. It's that ripping out of the nominee from acting service that creates a particularly stark conflict that Congress sought to address through the notwithstanding A1 clause. Kagan. Kagan. I have to say I find it a little bit odd to think of this drafter, thinking of the kind of distinction that you are making, saying, well, this is self-executing and this is not self-executing, it's only a broad grant of discretion, and then not realizing that just by virtue of saying notwithstanding A1, the statute creates or raises this question about, well, you've said A1 but not A2 or A3, what does that mean? I mean, that seems just like a very strange drafter to me, somebody who is so in the weeds that they can't figure out that pretty obvious objection to the fact that the Well, perhaps one way to think of it, and this goes back to your first question of the argument, what if you had a statute that didn't have any notwithstanding clause at all at the beginning of B1? In that situation, it would be clear that person and section would make B1 applicable to A2 and A3. There would be a question in that situation, though, whether B1 also applied to A1. First of all, because of the starkness of the conflict between A1 and B1, and second of all, the government argues that the general versus specific canon would apply there, but it wouldn't necessarily, because the general versus specific canon is typically invoked in order to avoid superfluity, where you have one general provision and a specific provision that would be meaningless if not read as an exception to the general. Here, however, in the hypothetical statute without the notwithstanding clause, you wouldn't have that superfluity concern because B1 would apply to A2 and A3. And so you would be left with a particular question, not about 2 and 3, but just about 1. And so it makes sense that Congress singled out 1 because of the particular role that it's playing in the statute. And it does that. Sotomayor, isn't under your reading it will never be in effect? No. No, Your Honor. First of all, the officials under C1 are not acting officials. They are receiving term extensions. The language of C1 talks about those individuals continuing to serve in the office. A1 through 3 all talk about performing the functions and duties of the office temporarily in an acting capacity. The legislative history likewise talks about three categories of acting officials, and it consistently talks about A1, 2, and 3. And so C1 is just functioning separately. That's just a different thing. Sotomayor, so why aren't A2 and A3 functioning separately from A1? If C1 can function separately, and that was the thought of the drafters, why don't we carry it to its logical conclusion that A1 is separate from? They are written almost identically. The President may direct, may appoint, may they are all sort of exceptions to the rule. The reason that C1 functions separately is that it describes the work that the official is doing in a different way. It describes continuing to serve in the office. A1 through A3 all describe the work that the official is doing in the same parallel way, performing the functions and duties of the office temporarily in an acting capacity. That's why the three categories of acting officials are A1 to A3, but C by its text is just doing something different. Breyer, why the thing – I'd like to go back to the Solicitor General's last point, and that's where I'm having – I have a puzzle. I'd like to hear what you have to say. I mean, for the purposes of this question, I'm assuming all the text which sounds to me, if Erson came from Mars, that's what he would expect a legal argument to be like. The number is all over the place, and I will also assume that for every chef's salad there is a countervailing strawberry shortcake, all right? So everything balances out, assumed. Now, it seems to me that this exception here is saying this. We have the Secretary of the Treasury. He has five assistants. Each is a presidential appointee. One day, Assistant Secretary of the Treasury No. 2 dies. And now the President can fill that role with any one of three people on an acting basis, his first assistant, some other assistant secretary or deputy in the Treasury Department, or a GS-18. Have I got it right so far? Yes, Your Honor. I'm using examples. Now, what this statute, as you read it, would seem to say, if you have a presidential position, if you appoint whichever one you choose, put any one of those three people in, go ahead, do it. Now, if you nominate those one of those three to a presidential position, roughly, they're out. All of them are out. Oh, wait, there's one exception. The first assistant is not out if he's served for 90 days as first assistant. Have I got the statute right? Yes, Your Honor. Okay. I would just wonder, were I from Mars, what's the point of such a statute? Why is it you're perfectly willing to have stay there and do the acting job, the first assistant, if he served 90 days before, but you're not willing to have serve the acting job this guy who was a GS-18 in the same department or the person who was an assistant secretary of the Treasury No. 2? Why? I can't think of an answer, given your interpretation. I can think of an answer, given their interpretation. I say what they were worried about on their interpretation were our friends No. 2 and No. 3, the GS-18, and the assistant secretary No. 2. They can continue to serve on their interpretation. Hey, why did they do this? The name of that explanation is called Bill Lan Lee, because that was the problem that gave rise to the statute, and on their interpretation, they passed some words that solved that problem. So there we are. I get an explanation for his, assuming that you like purposes more than you like numbers. I get an explanation on his, and I don't get an explanation on yours. So that's what I would like you to respond to. So I'd like to respond, first of all, to why it makes sense to treat first assistants differently, and second of all, to Bill Lan Lee and how that is relevant to this statute. The legislative history explains in multiple places that first assistants are particularly well suited to be the acting official because they represent continuity and regularity in the office. We know from B-1 that Congress was concerned with at least some acting service by nominees, and the reason that it created an exception for first assistants even as nominees is that they are the least likely to represent change in the agency. It's just the deputy being pushed up one spot, and that's continuity and regularity. On the other hand, particularly when Congress added for the first time in the FVRA this category of GS-15s, potentially thousands of employees within an agency, there's no accountability there to Congress, and there are potentially much greater concerns about those individuals serving as acting officials while the nominee. The facts of this case illustrate that concern. The President designated Mr. Solomon to serve as the acting general counsel. Some months later, he nominated Mr. Solomon. Perhaps emboldened by the nomination, Mr. Solomon then took some very controversial actions that led the Senate promptly to make clear to the President that this individual was not going to be confirmed. Rather than at that point finding a new nominee, the President allowed Mr. Solomon to continue serving even after the nomination had been returned by the Senate, waited four months before renominating the same individual, and then only a few months later after that finally came up with a nominee that the Senate approved. In the meantime, Mr. Solomon served, even though the Senate quite clearly did not consent to him, served in the job for over three years. And so it is that kind of concern about GS-15s that's fundamentally different from a first assistant who represents continuity and regularity serving in the office. Ginsburg. If Mr. Solomon had been confirmed, you say that that would be all right, even with the erroneous nomination of him while he was acting. But so he's confirmed for the permanent office, yet under your reading, everything that he did while he was acting is invalidated, is that right? Well, it's not necessarily invalidated. It's subject to the defenses that the D.C. Circuit identified at the end of its opinion. But under our reading of the statute, when he was nominated, he needed to step aside and he couldn't serve as the permanent official until the Senate confirmed him. So his confirmation would be irrelevant to what happens to what was done prior to the confirmation? That's right. His confirmation does not, in effect, ratify the actions that he took when, in our view, he was improperly serving as an acting official. Is one other peculiarity of this, Justice Breyer mentioned the 90 days, but a first assistant who is also what they call a PAS, presidentially appointed, senatorial confirmed, such a first assistant, without any 90 days, can simultaneously be acting and a nominee. But why couldn't the people in Category 2, that is, people who are presidentially appointed, senatorially confirmed, in other agencies, why wouldn't the same ‑‑ why wouldn't they be treated the same way, if the stress is on having someone that the Senate wants approved? Because Senate confirmation for one position is not fungible with Senate confirmation for another. When you're talking about a Senate-confirmed first assistant, that, again, is a combination of Senate confirmation and somebody who is in a first assistant position representing continuity and regularity in the position. Somebody who is confirmed for a completely unrelated Senate position is much more of an end run around the Senate's advice and consent role for the vacant office. And the legislative history includes examples, includes discussion, of Congress's concern about PAS officials who were being moved around from one position to the other. You want to respond to Justice Breyer's point about Mr. Lee? I do want to get back to the point about Mr. Lee. The concern about Mr. Lee was not just that he was brought in from the outside at the last minute, which is what the government emphasizes. If that were the concern, Congress could have imposed a restriction on short-serving first assistants as acting officials. Instead, what Congress imposed was a restriction on acting officials, on acting officials who are also the nominees. And there's no reason to think that Congress's concern about nominees serving as acting officials was limited just to first assistants. The text doesn't support that concern, and as the example of Mr. Solomon's own service illustrates, in practice, Congress can have very serious concerns about people outside of the first assistant category serving as the acting official while also the nominees. And that's a vivid illustration of the example in our brief of somebody who can serve almost an entire presidential term as the permanent non — as the acting official, even though Congress has made clear that the individual is not somebody that the Senate will consent to as the permanent nominee. Can I ask, Mr. Duvert, about the postannouncement history? Because, you know, we're generally reluctant to demand the Congress objects to things, but on the other hand, the — the history here is so strong, all of these appointments — 100 plus of them — in a time when Congress and the president — I mean, this has — this has been a time where there's been a lot of partisan bickering over appointments, and you would think that in that context, if anybody had thought that this statute could be read differently, we would have heard about it. And yet we hear absolutely nothing. So how do you explain that? Several points in response to that. First, just identifying these FVRA violations is not an easy thing to do. It took the government months of study to do it, and it's an arcane technical issue. Second of all, even if Congress had identified the violations, what was it supposed to do about them? If the nominee is somebody that the Senate wants to approve, there's no point in rejecting them based on their past improper service. That's not what the FVRA requires, and doing so would only prolong the vacancy with another acting official that Congress hadn't approved. If Congress doesn't approve of the nominee, odds are it has a reason for doing so that is much more of a headline issue than the FVRA. The FVRA does not make the front page of the Washington Post. It's other objections. Kagan. Well, I don't know. Wouldn't you say something like, I don't like this nominee, and anyway, it's illegal for the President to make this nomination? You might add that, but it would be a gratuitous addition to what is really the fundamental concern with the nominee. Seems like it gives it some real extra oomph, right? It's not just a matter of, you know, my preferences versus the government's preferences. Now the President's preference is illegal. It's off the board. Congress has said he can't do it. Who wouldn't say that in that circumstance? Somebody who then was going to be pressed and had to explain the technicalities of why the appointment was illegal. Breyer. You have been, and I understand, you have been concerned about instances in which there is controversy over the appointment, but there are thousands of jobs in the government where they have to run departments where there is no controversy. You know, and people leave or they die or something happens as a vacancy. And the main institutional imperative is keep the job being done, keep the office working. So an obvious person is to say, Mr. First Assistant, you carry on, okay? And maybe you bring in somebody from next door. And maybe you look for a GS-18 in the department. You know, the guy next door has a presidential appointment. So you put him in the job. That's all. No problem. And why all of a sudden Congress would, in these thousands of instances where there are hundreds anyway, Congress would say, if you decide to appoint him permanently, you have to take him immediately out of the acting position and there is more disruption in the department. Why would anyone want to do that? Now, I can see they might want to do it with that First Assistant where it's a run-around. And they have an idea that it's a run-around when he hasn't served as First Assistant for more than 90 days. Then you might say, well, why him? And maybe they were just trying to get this controversial guy in. In other words, as an administrator in non-controversial matters, I can understand their interpretation more easily. But you will tell me that I'm wrong because? The first assistant restriction in B-1 reflects that Congress clearly was concerned about some acting officials who are also the permanent nominee. Congress saw that as a particular affront to its advice and consent role, and that exemplifies a lot of the problems that led to the enactment of the FVRA, in which the presidents, presidents of both parties, were putting in their ultimate choice for a position long term without Senate confirmation. There's no reason to think that that concern is limited only to, at first, assistants coming in from the outside. Those concerns are equally applicable to any of the thousands of GS-15 employees within an agency, and it's not surprising that in the same set of revisions when Congress added A-3, it made those GS-15s eligible to serve, that it also thought, well, perhaps this has the potential for mischief. Perhaps this has the potential to allow just as much of an end of a runaround of our advice and consent role as the first assistants. Likewise, with respect to the PAS officials, it's true that PAS officials had previously been able to serve as both permanent nominees and acting officials, but the FVRA rethought this entire area of vacancies. And it's not surprising that while your – while Congress was also prohibiting GS-15s, this new category, from serving as acting officials while nominees, that it also swept in the A-2s as well. There's also a practical point about how this actually operates. Much of the time, over 30 percent of the time, the president nominates and designates either at the same time or – or the president nominates first and designates second after apparently becoming impatient with the confirmation process. And so, Justice Breyer, your hypothetical – your hypothetical was asking why does it make sense to take the official out of the job once they're nominated? Often that doesn't even happen. Often the president is nominating the person and then making them the acting official later. So you're not taking the person out of the job. Moreover, our interpretation of the statute removes one person from the pool of acting officials. There is not – this is not a situation where we are taking out the thousands of GS-15s or PAS officials. There are lots of people available to serve. We're taking out the one person that reflects the biggest affront to Congress's advice and consent role if allowed to serve while also the nominee. Sotomayor But that's not impeding the efficient running of the Department at the same time, because if the person's been running the Department, now you're going to put it through a second dislocation of having that person removed and somebody else step in. Again, in practice, over a third of the time that doesn't happen. It's also something that the President— It hasn't happened because no one's read it the way you have and invalidated that person's actions so far. No, what I mean is that if you look at the government's chart, a third of the time, even if you applied our interpretation, it would not result in the nominee being taken out of acting service because the nominee isn't even put into acting service until later or at the same time as the nomination. Moreover, the President— But the Senate is taking a long time to confirm, even when they're not objecting. So in this particular case, after Mr. Solomon had served for some two and a half years, when the President put up a permanent nominee, the Senate confirmed him in a matter of months. And so the Senate doesn't always take a long time. Moreover, the Senate has confirmed approximately 85 percent of PAS officials during the current President's administration. And so the Senate is confirming these officials. What the FVRA requires is that the official not do the job without Senate confirmation, because that would recreate the very problems that the FVRA was intended to combat in the first place. There's a limited exception for long-serving or Senate-confirmed first assistants, but that makes policy sense because of the continuity and the regularity that they bring to the job. I'd like to address the question that was raised earlier about the consequences of ruling in our favor retroactively in terms of past decisions. No court has considered the no force and effect language, but what I can tell you is that the government has been shoring up a defense that would be tied to the language in 3348 about the functions and duties of a particular office. The only actions that have no force and effect are those that are taken in the performance of a function and duty of a vacant office. In response to a Senate inquiry about a deputy EPA administrator who had been serving for two years, the EPA took the position that that individual had not taken any actions whatsoever that were actually tied to the functions or duties of the vacant office. On the GAO website, there are approximately two dozen reports of time violations over the years of the FVRA. And the GAO reports that agencies had reported to it that none of those two dozen individuals who served in violation of the FVRA took any actions that were tied to the functions and duties of the office. And so the government is already shoring up arguments for why the no force and effect language would not undo actions taken by these improperly appointed officials. With respect to the GAO, the acting solicitor general referred to the GAO as a watchdog. I'm glad you sound a bit skeptical of those defenses. Verrilli, Well, skeptical only in the sense that they're not at issue in this case and they haven't been litigated. But if it were, if ruling in our favor, we're going to lead the sky to fall, you would expect the government to tell you that. And not only has the government not told you that, but the surrounding context shows that the government thinks it has pretty good arguments for why. Sotomayor, tell you so that you can bring those cases to? Verrilli, I'm sorry? Sotomayor, tell you so that you can bring those cases to? Or for other people to bring them? They're in a real catch-22 situation. Verrilli, The fact is, though, it's their burden to show the consequences of their actions. And the government's track record on this shows just the opposite, shows that these officials supposedly are not doing anything that would actually be invalidated. Ginsburg, So is Mr. Solomon's case atypical, the general counsel to the NLRB? Verrilli, Well, it's atypical in the sense that it is under 3348e, the no-force-and-effect language doesn't apply to the general counsel of the NLRB. It's the his actions are only voidable rather than void, and that's why the D.C. Circuit looked to the harmless error doctrine and the de facto officer doctrine as additional defenses. But even in a case where the no-force-and-effect language did apply, again, on the government's theory, challengers would have to show that the actions were the actions that were taken were ones that could only have been taken by an individual in the vacant office. And the government doesn't believe that that happens very much. With respect to the cases that the government cites for the first time in its reply brief, none of those are on point. The Prasalt case, the operative language there was under this Act. That's what made clear that the particular provision there applied only to the statute at issue and not separately to the Tucker Act. The Mount Vernon case out of the Ninth Circuit, interpreting the notwithstanding clause, the language in the notwithstanding clause there to apply to all of A would have created superfluity, which is not the case here. To the contrary, here the government's interpretation makes B too superfluous. Congress specifically added B-2 when it expanded B-1 to apply to more than just first assistance. And if B-1 did not apply to all of A in the first place, there would be no need under B-2 to create an exception for Senate-confirmed first assistance. Those Senate-confirmed individuals could serve under A-2 anyway. So the only reason that Congress would have had to add that B-2 was because B-1, pursuant to these changes to the statutory language, otherwise applied to all of A. The government argues in its reply brief that B-2 serves a purpose because it saves the President from having to designate someone under B-2. That's not a plausible account that Congress would have gone to all the trouble of adding B-2 solely to achieve that goal. And, again, I would return to the core language here, which is that the State language is person and section. Those are broad, inclusive terms. If Congress had meant to accomplish what the government argues that this statute is accomplishing, it could be. Ginsburg. What about the argument that that language, person and this section, were in the prior bill where it applied only to first, what do you call it? Only to first assistance. First assistance. Because that's true, but the language in the prior bill had an old version of B-1. This is, again, at 19A of the cert petition, that made clear that the only persons we were talking about were persons who are serving as first assistance. There was immediate qualifying language that made clear and narrowed what person meant. Congress specifically deleted that language, and it added a new B-2 that would be unnecessary if B-1 applied only to A-1. If Congress had simply meant to achieve in the draft what the government ascribes to it, the edits could have been much simpler. It could have simply changed 180 days to 90 days in order to shorten the required period of acting service. And it could have edited the existing B-1 to say such person serves in the position of first assistant to the office of such officer. It made much broader changes. Roberts. Thank you, counsel. Four minutes. Mr. Gershengorn. Thank you, Mr. Chief Justice. I'd like to make a number of points. First, Justice Kagan, your account of what would have happened in Congress had there been any reason to believe there was a problem with what the executive was doing is exactly right. And we know that because after the D.C. Circuit ruled, in fact, what you said would happen is what happened. Senators started raising objections to the President's nominees, arguing that they were serving illegally. That's what happened in the years prior to the Act, and that's what happened as soon as the D.C. Circuit ruled. That in-between period, I submit, is very significant. Justice Sotomayor, you raised Section C-1. I think you're exactly right. What their reading of the statute does is read the notwithstanding A-1 to mean notwithstanding A-1 to mean that it applies to A-1, A-2, and A-3, but not C-1. I think that's a very odd thing to express with the term notwithstanding A-1. Justice Breyer, you were asking about why it would make sense to treat the A-2 and A-3 differently, and I think you're exactly right. It does not. What Respondent said was there needs to be accountability to Congress. Congress put in that accountability. It said that these individuals under A-2 and A-3 need to be personally designated by the President. It cannot be delegated. That is the kind of responsibility that when Congress puts that in the President, this — it's not surprising, then, that those folks should be able to serve while they're nominated, because they have gotten not only a Senate confirmation or longstanding agency service, but the personal approval of the President. Counsel tried to distinguish the cases that we raised. I think they're worth raising, because it does change, I think, the way this — this Court has read the notwithstanding clause the way we say. Persault is a perfect example. It said notwithstanding this Act, but Congress then didn't read the remainder of clause to provide — to apply to the whole code. It limited to the Act, which was what was specified in the notwithstanding clause. We think that that's what this Court should do here. And then, finally, I'd like to address this — the treatment of PAS officers, which I think is really important. What Respondent said was, oh, Congress swept in A-2 as well. With that blithe assertion, he attributes to Congress the intent to overturn 130 years of practice that had raised no complaint. There is no evidence anywhere in the congressional record that Congress was concerned about Senate-confirmed officials also — who were also nominated. And it was not reflected in the initial draft. The idea that Congress blithely did that and swept in A-2, I think, is just not supported by the record. And I'm sorry, one more point, one final point. Justice Ginsburg, I think you're exactly right on the person section point, which Justice Kennedy also had raised. That language was in the prior bill. There is no doubt that the provision it was in applied — applied in addition to only — applied only to first assistants. And our point is that person and section, of course it's broad, but all that does is set up the conflict. Congress understood that. So how did it resolve the conflict? Not in the most natural way under — that Respondent would have this Court understand, by saying notwithstanding subsection A, which would have taken out all of the problem. Instead, it said notwithstanding subsection A-1. And the idea that Congress did that because there was no conflict between A-2 and A-3 and — and B-1 just doesn't hold water. Finally, on that point, I know that's my third finally, and I apologize, Your Honor. But the — it does seem that the notwithstanding A-1 doesn't do any work in their reading. If Congress had just said A-1 and then had had B-1 without the notwithstanding clause, this Court would have understood B-1 to be a limitation on A-1's authority without a doubt. And so what notwithstanding A-1 does is specify the order of operations to specify the provision that is overridden. And this Court should give that — that congressional decision respect. Thank you. Roberts. Thank you, counsel. The case is submitted.